UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

ELIZABETH LOEB
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7166
Washington, D.C. 20044
(202) 616-8916
Elizabeth.Loeb@usdoj.gov
Attorney for Plaintiff United States

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| Plaintiff. | ) ) | |
| v. | ) ) | Civ. A. No.: 2:15-cv-00200-EJL |
| CLEARWATER PAPER CORPORATION, | ) ) ) | |
| Defendant. | ) ) ) ) | |

**MOTION TO ENTER CONSENT DECREE**

Plaintiff, the United States of America, respectfully requests that the Court enter the Consent Decree (the Consent Decree or Decree) that was lodged in this case on June 9, 2015 (ECF No. 2). The United States published notice of the Consent Decree in the Federal Register on July 16, 2015 (80 Fed. Reg. 34458-59) and solicited public comments thereon. No comments were received. The United States believes that the Consent Decree is fair, reasonable and adequate, and consistent with the Clean Air Act (CAA). Therefore, the United States respectfully requests that the Court now enter and sign the Consent Decree (on page 26).

**United States v. Clearwater Paper Corporation Motion to Enter Consent Decree      Page 1**

## BACKGROUND

I. FACTUAL BACKGROUND

### A. Defendant Clearwater Paper Corporation

Defendant Clearwater Paper Corporation (Clearwater or Defendant) owns and operates a paper and pulp mill in Lewiston, Idaho which manufactures bleached Kraft pulp from wood chip and sawdust. Clearwater's Lewiston mill uses a Kraft pulping process and makes pulp in two fiberlines, a chip fiberline (which makes pulp from wood chips) and a sawdust fiberline (which makes pulp from sawdust). The pulping process starts with wood fibers (in the chip fiberline) or sawdust (in the sawdust fiberline), which are chemically "cooked" in a caustic solution called white liquor. The "cooking," also known as "digestion" takes place in large heated and pressurized vessels called digesters. The digestion process creates pulp along with gaseous byproducts that include Hazardous Air Pollutants (HAPs) and sulfurous gases. After digestion, units called "washers" separate the pulp from the spent cooking liquor and bleach the pulp. These digestion and washing processes generate Total Reduced Sulfur (TRS) and volatile organic HAPs (including methanol).

II. RELEVANT STATUTORY AND REGULATORY PROVISIONS

Pursuant to Section 111(a) and (b) of the CAA, 42 U.S.C. § 7411(a) and (b), the Environmental Protection Agency (EPA) promulgated New Source Performance Standards (NSPS) for categories of "new" "stationary sources" that are determined to cause or significantly contribute to air pollution which may endanger public health or welfare. EPA promulgated NSPS general provisions (NSPS Subpart A) applying to all stationary sources subject to the NSPS. NSPS Subpart A requires that owners and operators of subject sources, to the extent

practicable, maintain and operate any NSPS affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practices for minimizing emissions. 40 C.F.R. § 60.11(d). EPA has also promulgated specific NSPS for different categories of stationary sources, including Kraft pulp mills, codified as NSPS Subpart BB, 40 C.F.R. § 60.280 et seq. (NSPS Subpart BB). NSPS Subpart BB applies to "brown stock washer systems" that commenced construction or modification after September 24, 1976 at "Kraft pulp mills". *See* 40 C.F.R. § 60.280. Among other things, NSPS Subpart BB prohibits the discharge into the atmosphere from a brown stock washer system any gases which contain TRS in excess of 5 parts per million (ppm), subject to certain exceptions not applicable here. 40 C.F.R. § 60.283(a). Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits the operation of any "new source" of air pollutants in violation of an NSPS applicable to such source. Thus, a violation of an NSPS requirement is a violation of CAA Section 111(e).

Pursuant to Section 112(c) and (d) of the CAA, 42 U.S.C. § 7412(c) and (d), EPA promulgated National Emissions Standards for Hazardous Air Pollutants (NESHAPs) for "major sources" including for the Pulp and Paper Industry, codified as Subpart S, 40 C.F.R. §§ 63.440-459 (NESHAP Subpart S). NESHAP Subpart S imposes emission control and work practice requirements on, among other things, washers and digesters in paper and pulp mills. The CAA and NESHAP regulations prohibit the operation of any "affected source" in violation of an applicable NESHAP. *See* 42 U.S.C. § 7412(i)(3); 40 C.F.R. § 63.4(a).

Title V of CAA, 42 U.S.C. §§ 7661a-7661f, establishes a state-administered operating permit program for various sources of air pollution, including major sources and any other sources subject to regulations promulgated under Sections 111 and 112 of the CAA. 42 U.S.C.

§ 7661a.  Pursuant to Title V statutory provisions and regulations, states issue an operating permit to each source that contains all "applicable requirements" for compliance with the CAA, including NSPS and NESHAP requirements.  Under Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b), it is unlawful for any person to operate a subject source except in compliance with a Title V permit.  Violations of Title V permits are subject to federal enforcement under Section 113(a)(3) of the CAA, 42. U.S.C. § 7413(a)(3).  During the time period relevant to the Complaint, the state of Idaho Department of Environmental Quality (IDEQ) issued Clearwater two successive Title V permits, one in 2007 (2007 Title V Permit) and one in 2010 (2010 Title V Permit).  Both of these permits incorporate the requirements of NSPS Subparts A and BB, and NESHAP Subpart S.

III.     ALLEGATIONS IN THE COMPLAINT

Plaintiff, the United States of America, on behalf of EPA, filed the Complaint in this action concurrently with the filing of the Consent Decree asserting claims for penalties and injunctive relief under the CAA and the NSPS and NESHAP regulations promulgated thereunder, and under Title V, with respect to Defendant's Lewiston pulp and paper mill. (ECF No. 1).  The Complaint asserts the following violations:  (1) violations of NSPS Subparts A and BB, 40 C.F.R. §§ 60.11 and 60.280-285; (2) violations of NESHAP Subpart S, 40 C.F.R. §§ 63.440-459; and (3) violations of Clearwater's Title V permits issued by the IDEQ which incorporate the above-listed NSPS and NESHAP requirements.

The Complaint alleges that Clearwater violated NSPS Subparts A and BB, NESHAP Subpart S, and the corresponding provisions of Clearwater's Title V permits at two pulp washers (washers) in its chip fiberline.  Specifically, in 2009 EPA discovered that eleven doors on two

Clearwater washers "puffed" process gases directly into the atmosphere from what appear to be defects in the washer doors. The Complaint alleges that these "puffs" violated the NSPS Subpart A requirement that owners and operators, to the extent practicable, maintain and operate air pollution sources in a manner consistent with good air pollution control practice for minimizing emissions, and Clearwater's Title V permits incorporating that same requirement. *See* Subpart A, 40 C.F.R. § 60.11(d); Conditions 12.13 of the 2007 Title V Permit; Conditions 1.19 and Table 1.3 of the 2010 Title V Permit.

The Complaint further alleges that the washer puffs emitted TRS in excess of 5 ppm, the limit imposed on such washers by NSPS Subpart BB, 40 C.F.R. § 60.283(a)(1), and Condition 12.14 of the 2007 Title V Permit and Condition 13.2(a)(1) of the 2010 Title V Permit.

Finally, the Complaint alleges that Clearwater's washers violated the following requirements in NESHAP Subpart S (also incorporated into its Title V permits): (a) that negative pressure be maintained at each washer for "each enclosure or hood opening" (40 C.F.R. § 63.443 incorporating requirements of 40 C.F.R. § 63.450); (b) that Clearwater visually inspect the washer enclosure at least every thirty days to ensure each washer enclosure opening is maintained in the closed position and sealed (40 C.F.R. § 63.453(k)(1)); (c) that Clearwater visually inspect the washers every thirty days, including the ductwork, piping, enclosures, and connections to covers for visible evidence of defects (40 C.F.R. § 60.453(k)(2)); (d) that Clearwater test each washer enclosure opening initially and annually to ensure it is maintained at negative pressure (40 C.F.R. § 60.453(k)(4)); and (e) that Clearwater implement corrective actions as soon as practicable to address "visible defects in ductwork, piping, enclosures or connections to covers" and washer enclosure openings "not maintained at negative pressure" (40

C.F.R. § 60.453(k)(6)). *See also C*ondition 17 and App. A, Conditions 39, 40.b, and 40.c, of the 2007 Title V Permit and Conditions 17.5, 17.6.1, 17.23, and Table 17.5 (top box) of the 2010 Title V Permit.

The Complaint also alleges that Clearwater violated NESHAP Subpart S (and parallel Title V permit) requirements at two sawdust digesters in the sawdust fiberline which produces pulp from wood sawdust. Subpart S requires such digesters "be enclosed and vented into a closed vent system and routed to a control device" that meets the requirements specified in 40 C.F.R. § 63.443(d), which requires that the control device must reduce total HAP emissions by 98 percent or more by weight or be one of several specified control options. 40 C.F.R. § 63.443 (a) and (c). While the majority of gases from the Clearwater digesters were collected in the mill's closed-vent collection system and combusted in an incinerator or a lime kiln, a small portion of the digester gases were being vented to the sawdust bin and emitted from there to the atmosphere. The Complaint alleges that this set up violated NESHAP Subpart S because the sawdust bin is not a specified control device under 40 C.F.R. § 63.443(d) and does not reduce HAP emissions by 98 percent or more by weight as required. *See* 40 C.F.R. § 63.443(a), (c) and (d). *See also* Condition 17 and Appendix A, Conditions 39, 40.b, and 40.c of the 2007 Title V Permit and Conditions 17.1, 17.2, 17.3 and Table 17.1 of the 2010 Title V Permit.

IV. CONSENT DECREE PROVISIONS

The proposed Consent Decree settles all of the claims alleged in the Complaint. Clearwater fixed the washer doors in 2013 so the violations associated with the puffing have ceased. The Consent Decree requires Clearwater to re-route the gases from the digesters that currently flow into the sawdust bins to the control device that receives the other digester gases.

ECF No. 2 at ¶ 17.  The Consent Decree requires Clearwater to complete this re-routing by September 30, 2015.  *Id.*  The Consent Decree also requires Clearwater to pay a civil penalty of $300,000 plus interest accruing from March 24, 2015.  ECF No. 2 at ¶ 11.  The Consent Decree also contains stipulated penalties if Clearwater does not comply with its requirements.  ECF No. 2, Section VII.

## ARGUMENT

I. STANDARD OF REVIEW

The standard of review of the proposed Consent Decree is whether the settlement is fair, reasonable and adequate.  *United States v. Oregon,* 913 F.2d 576, 580 (9th Cir. 1990), *cert. denied,* 501 U.S. 1250 (1991); *United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992); *Citizens for a Better Env't v. Gorsuch,* 718 F.2d 1117, 1126 (D.C. Cir. 1983), *cert. denied,* 467 U.S. 1219 (1984).  It must also be consistent with the governing statute.  *See United States v. Union Elec. Co.*, 132 F.3d 422, 430 (8th Cir. 1997); *United States v. Findett Corp.*, 75 F. Supp. 2d 995, 1000 (E.D. Mo. 1999).

This standard of review is limited and reflects that "public policy favors settlements as a cost-efficient and convenient means of resolving disputes and conserving judicial resources." *United States v. Bliss*, 133 F.R.D. 559, 567 (E.D. Mo. 1990).  "The law strongly favors settlements.  Courts should hospitably receive them . . . .  As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming." *Little Rock Sch. Dist. v. Pulaski*, 921 F.2d 1371, 1383 (8th Cir. 1990).  In addition, voluntary settlements are preferred because when the effort to settle is successful, "the parties avoid the expense and delay incidental to litigation of the issues; the

court is spared the burdens of a trial and the preparation and proceedings that must forerun it." *Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 80 (3d Cir. 1982).

Accordingly, while approval of a settlement is committed to the informed discretion of the trial court, *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1019 (8th Cir. 2002), courts usually exercise this discretion in a limited and deferential manner. *See Bliss*, 133 F.R.D. at 567 ("A court's approval of a consent decree is discretionary, but the Court's role is limited."); *Findett*, 75 F. Supp. 2d at 1000 ("In reviewing a proposed consent decree . . . a district court's function is 'circumscribed.'"). In particular, because a consent decree is a settlement agreement subject to continued judicial policing, in reviewing a consent decree the court does not inquire "whether the settlement is one which the court itself might have fashioned, or considers as ideal . . . ." *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1036 (D. Mass. 1989) (citations omitted), *aff'd*, 899 F.2d 79, 84 (1st Cir. 1990). Nor does a reviewing court seek to determine whether the proposed settlement provides for "every benefit that might someday be obtained in contested litigation." *United States v. Allegheny Ludlum Indus., Inc.*, 517 F.2d 826, 850 (5th Cir. 1975). And, a court is not authorized to rewrite or modify the parties' agreement; it must consider and approve or reject as a whole the proposal as submitted by the parties. *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982); *Brooks v. Georgia State Bd. of Elections*, 59 F.3d 1114, 1119-20 (11th Cir. 1995); *United States v. Jones & Laughlin Steel Corp*., 804 F.2d 348 (6th Cir. 1986).

Finally, as the Ninth Circuit has noted, the balancing of competing interests affected by a proposed consent decree to which the United States is a party "must be left, in the first instance, to the discretion of the Attorney General." *United States v. Bechtel Corp.*, 648 F.2d 660, 666

(9th Cir. 1981); *accord United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 746 (9th Cir. 1995) (A district court reviewing a proposed consent decree "must refrain from second-guessing the Executive Branch."); *accord S.E.C. v. Randolph,* 736 F.2d 525, 529 (9th Cir. 1984) ("courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment"). Judicial deference to a settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA, which enjoys substantial expertise in the environmental field." *United States v. Akzo Coatings, Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991). Thus, where an agency charged with enforcing environmental statutes has negotiated an agreement, there is a presumption of validity to the settlement and the discretion given to EPA in enforcement "carries over to discretion in fashioning settlement." *E.P.A. v. City of Green Forest*, 921 F.2d 1394, 1402 (8th Cir. 1990); *Kelley v. Thomas Solvent Co.*, 790 F. Supp. 731, 735 (W.D. Mich. 1991); *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 681 (D.N.J. 1989).

II. **THE PROPOSED CONSENT DECREE IS FAIR, REASONABLE AND ADEQUATE, AND CONSISTENT WITH THE CAA**

This Consent Decree satisfies the three-part test for district court approval of a settlement: the Decree is fair, reasonable and adequate, and consistent with the CAA. Accordingly, the Court should enter the Decree.

A. **The Proposed Consent Decree is Fair**

When analyzing the fairness of a settlement, courts examine the "candor, openness, and bargaining balance" of the negotiation process. *United States v. Union Elec. Co.*, 934 F. Supp 324, 327 (E.D. Mo. 1996), aff'd, *Union Elec. Co.*, 132 F.3d 422; *BP Amoco*, 277 F.3d at 1018; *Findett*, 75 F. Supp. 2d at 1000. The Court must determine if "the settlement was the result of

good faith arm's length negotiations." *United States v. Hercules, Inc.*, 961 F.2d 796, 800 (8th Cir. 1992); *BP Amoco*, 277 F.3d at 1019-20).

In this case, the settlement is the result of good faith and hard, arm's length bargaining between Plaintiff and Defendant. Negotiations began in January of 2013 between the Department of Justice, on behalf of EPA, and the Defendant, who was represented by experienced outside environmental counsel. The Parties reached an agreement in principle and then exchanged draft settlement documents that ultimately became the mutually acceptable Consent Decree currently before the Court. This process was robust and sometimes contentious, which reflects the good faith and arms-length efforts of the Parties.

### B. The Consent Decree is Reasonable and Adequate

The "reasonableness" of a decree can be determined in light of the considered risks of litigation and whether it is technically adequate and compensates the public for the alleged violations. *See Bliss*, 133 F.R.D. at 568; *Cannons*, 899 F.2d at 90. In assessing reasonableness, the Court looks to "the decree's likely efficaciousness as a vehicle for cleansing the environment." *Cannons*, 899 F.2d at 89.

Applying this standard here, this Court should find that this Decree represents a reasonable resolution of the alleged violations. First, the Consent Decree is reasonable and adequate because it requires Defendant to re-route its digesters so that they will comply with NESHAP Subpart S requirements and the CAA. It also provides for stipulated penalties for further CAA violations during its term.

Second, the $300,000 penalty imposed by the Consent Decree is also reasonable and adequate. In determining a reasonable penalty, the CAA instructs courts to look at a variety of

factors including the seriousness and duration of the violations, the economic benefit to the violator arising from the violation, the size of the violator, and the history of prior violations. *See* 42 U.S.C. § 7413(e). EPA has a CAA Penalty Policy that provides a framework for analyzing these factors to ensure that the agency properly accounts for the statutory penalty factors in determining settlement penalties.[1] EPA analyzed the violations alleged in the Complaint under the statutory factors and penalty policy and this analysis supports the reasonableness of the penalty assessed. In determining the penalty, the United States also undertook a careful and informed assessments of the merits of the claims; the costs, risks, and delays that litigation would entail; and the benefits that will accrue by immediately implementing the injunctive measures required by the proposed Decree. Although the United States believes that it would ultimately prevail on the claims alleged in the Complaint and that a Court would award a substantial penalty, it could take years to litigate with no guarantee that the Court would find liability or award a penalty higher than that provided by the Consent Decree. Litigation would delay compliance with the CAA and consume a tremendous amount of the Parties' (and Court's) limited resources, which could instead be devoted toward remedying the environmental problems at issue here (and in other cases). As with any fair settlement, the Parties gain a benefit of immediate resolution and certainty, while foregoing the opportunity to seek an unmitigated victory. *See EEOC v. Hiram Walker & Sons*, 768 F.2d 884, 889 (7th Cir. 1985).

Last, both the injunctive relief and penalty to be paid under the Consent Decree are reasonable because they will deter other prospective violators by showing that noncompliance is costly and will likely be detected and addressed by governmental authorities. *See, e.g. Friends*

---

[1] Clean Air Act Stationary Source Civil Penalty Policy dated October 25, 1991.

*of the Earth, Inc. v. Laidlaw Envtl Serv.*, 528 U.S. 167, 184 (2000) ("Congress has found that civil penalties in [CWA] cases do more than promote immediate compliance by limiting the defendant's economic incentive to delay [compliance]; they also deter future violations"); *Eco. Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000) (discussing deterrent purpose of civil penalties under the CWA); *United States v. American Electric Power Service Corp.*, 137 F. Supp.2d 1060, 1068 (S.D. Ohio 2001) (under the CAA "the primary purpose of civil penalties is deterrence").

      C.      **The Consent Decree is Consistent with the Goals of the CAA**

Finally, the Consent Decree is in the public interest and "comports with the goals of Congress." *See Sierra Club v. Coca–Cola Corp.*, 673 F. Supp. 1555, 1556 (M.D. Fla. 1987). The CAA establishes a regulatory scheme designed "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). As noted above, the Consent Decree furthers those goals by requiring assurance that Defendant will comply with the CAA and NSPS and NESHAP regulations promulgated thereunder. As explained, above, entry of the Consent Decree will also deter similar violations by other paper and pulp plants. In both of these respects, the Consent Decree will reduce hazardous air emissions consistent with the purpose of the CAA to enhance the quality of the air and promote the public health and welfare.

## CONCLUSION

For the reasons set forth herein, Plaintiff the United States of America respectfully requests that the Court enter and sign the Consent Decree lodged on June 9, 2015. No proposed order is submitted because the Consent Decree has a signature line for the Court on Page 26.

Respectfully submitted,

THOMAS A. MARIANI, Jr.
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division

/s/ Elizabeth L. Loeb
ELIZABETH L. LOEB (member of the NY Bar)
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 616-8916
Elizabeth.Loeb@usdoj.gov

WENDY J. OLSON, IDAHO STATE BAR NO. 7634
United States Attorney

/s/ Joshua D. Hurwit
JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
Assistant United States Attorney
District Of Idaho
Washington Group Plaza Iv
800 East Park Boulevard, Suite 600
Boise, Id 83712-7788
Telephone: (208) 334-1211
Facsimile:   (208) 334-1414
Email: Joshua.Hurwit@usdoj.gov

CERTIFICATE OF SERVICE

      I, Elizabeth L. Loeb, certified that I caused the foregoing Motion to Enter the Consent Decree to be served this 23rd day of July, 2015, by first class mail, postage prepaid, upon the following counsel for the Defendant, Clearwater Paper Corporation:

Krista McIntyre, Esq.
Stoel, Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702-7705

Beth Ginsberg, Esq.
Stoel, Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101

                                                    /s/ Elizabeth L. Loeb
                                                    Elizabeth L. Loeb
                                                    Senior Counsel
                                                    U.S. Department of Justice